UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JASMINE MURPHY,<br><br>Defendant | Criminal No. 24cr10379<br><br>Violations:<br><br>Counts One-Seven: Wire Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1343 and 2)<br><br>Count Eight: False Statements to a Financial Institution; Aiding and Abetting<br>(18 U.S.C. §§ 1014 and 2)<br><br>Wire Fraud Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)<br><br>False Statement Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(2)(A)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

A. *Relevant Individuals and Entities*

1. The defendant, JASMINE MURPHY ("MURPHY"), was a resident of Boston, Massachusetts. MURPHY is presently a corrections officer with the Suffolk County Sheriff's Department, who was hired in or about January 2022.

2. The "Workforce Services Company" was a company based in Maryland that provided professional workforce services to various companies in Massachusetts and other locations in the Northeast. MURPHY worked as an employee for the Workforce Services Company from approximately July 2019 to May 2020.

3.  The "Trucking Company" was a business based in Massachusetts that provided asphalt delivery services in Massachusetts. MURPHY worked as an employee for the Trucking Company from approximately June 2020 to October 2020 and from May 2021 to October 2021.

4.  The Massachusetts Division of Unemployment Assistance ("DUA") was a state agency located in Boston, Massachusetts that administers unemployment benefits programs in the Commonwealth of Massachusetts.

5.  The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

6.  Customers Bank ("Customers"), was a federally insured financial institution with its headquarters based in Pennsylvania. Customers participated as a lender in a program referred to as the Paycheck Protection Program ("PPP") operated by the SBA and, thus, was authorized to lend funds to eligible borrowers under the terms of the PPP.

B. *Massachusetts Unemployment Insurance; Pandemic Unemployment Assistance*

7.  In the Commonwealth of Massachusetts, unemployment insurance ("UI") benefits are funded by the UI Trust Fund, which is comprised of federal funds, as well as monies obtained by state-imposed taxes on employers. DUA is responsible for administering the UI program in Massachusetts.

8.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. The CARES Act created a new temporary federal unemployment insurance program called pandemic unemployment assistance ("PUA"). PUA provided unemployment benefits for individuals who were not eligible for UI or other types of unemployment (*e.g.*, individuals who were self-employed, independent contractors, gig economy workers). All COVID-19 UI claims, and PUA claims, were eligible to receive additional monies and additional benefit weeks from temporary federal programs created by the CARES Act. Eligibility for PUA claims was verified against quarterly earnings reports of W-2 wage earners provided by employers to the Commonwealth of Massachusetts.

9.   Along with the UI program, the DUA administered and managed the PUA program in Massachusetts. CARES Act program monies were received by the DUA into a People's United bank account in Connecticut from the United States Treasury. The monies paid to the claimants for these programs were transmitted via interstate wire communications from Connecticut to the claimant's designated bank account or the bank account for a Bank of America pre-paid debit card.

10.   To receive PUA benefits, Massachusetts claimants were required, as applicable, to (i) create an online account to submit the application (also known as PUA registration); (ii) provide eligibility criteria; (iii) provide the reason(s) for unemployed status (*e.g.*, how COVID-19 affected employment); and (iv) certify that all the statements in the application were true, among other things. PUA claims submitted online to the DUA were processed via a server in Colorado.

11.   To continue to receive weekly PUA or UI benefits, as applicable, claimants were required to submit weekly certifications online to the DUA that confirmed that the applicant (i)

3

did not work during the weekly reporting period; and (ii) did not receive any income during the weekly reporting period. Weekly certifications submitted online to the DUA were also processed via a server in Colorado. It was material to the DUA that it received truthful, complete, and accurate information from applicants in the PUA registration, UI application, weekly certifications, and eligibility verification process, so that PUA and UI funds were disbursed to qualified and eligible recipients.

C. *The Paycheck Protection Program*

12. Another source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through the PPP. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds toward payroll expenses.

13. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.

14. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its (a) average monthly payroll expenses, and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required

4

to provide documentation showing their payroll expenses. For sole proprietorships (self-employed individuals), this documentation included the applicant's (sole proprietorship's) IRS Form 1040 Schedule C, which showed the profit and loss for the business.

15. A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

## Scheme to Defraud the DUA

16. During the periods of (i) in or about May to June 2020, (ii) from approximately May 2021 to September 2021, and (iii) from approximately January 2022 to February 2022, in the District of Massachusetts and elsewhere, MURPHY devised a scheme to defraud, and to obtain PUA and UI benefits, by filing false and fraudulent applications, weekly certifications, and other documents with the DUA.

17. The purpose of the scheme was for MURPHY to obtain PUA and UI payments under false and misleading pretenses, including, but not limited to: (i) making false statements about her weekly income and weekly employment status; (ii) using false personal identification information (*e.g.*, date of birth, social security number, middle initial); and (iii) using dummy mailing and email addresses.

*MURPHY Applies for PUA Benefits*

18. On or about May 10, 2020, MURPHY caused an online application to be submitted for PUA benefits ("PUA Registration"). In the PUA Registration, MURPHY submitted the following false information regarding her identification:

  a. Listing her middle initial as "C" when her actual middle initial was "G."

  b. Altering her social security number by one digit, using "3" instead of "8" for one of the social security number digits.

  c. Altering her date of birth by one digit, listing "1" instead of "8" for the day date.

  d. Listing a prior mailing address in Brockton instead of her current mailing address in Boston.

  e. Claiming that she did not have a driver's license or state-issued ID.

19. Although MURPHY submitted false identification data in the PUA Registration, MURPHY submitted her correct financial account and routing information to the DUA to ensure that MURPHY would receive any PUA benefit payments awarded to her.

20. After certifying that her statements were truthful and accurate, and acknowledging that her statements were made under the penalty of perjury and that she could be subject to criminal prosecution, (i) MURPHY checked the box stating that her employment was impacted by the following COVID-19 reason: "I am self employed, an independent contractor, or a gig worker and COVID-19 has severely limited my ability to perform my normal work" and (ii) MURPHY stated that the first date that she was accordingly impacted by COVID-19 was March 2, 2020.

21. In her PUA Registration, MURPHY stated that she was able and available to work during the period from March 1, 2020 to May 9, 2020, but MURPHY denied earning in excess of $89 in any work week between March 1, 2020 and May 9, 2020:

| Did you have earnings in excess of $89.00 in any work week between 01-Mar-2020 and 09-May-2020? | |
|---|---|
| Yes | No |

22. Following the submission of her PUA Registration, on or about May 17, 2020, MURPHY submitted a weekly certification ("Weekly Certification") to the DUA for the week ending May 16, 2020,[1] claiming that she did not work and did not receive any income during that weekly period:

**Earnings and Other Income**

Did you work or telework between Sunday, May 10, 2020 and Saturday, May 16, 2020? This includes both full-time and part-time employment.
- Yes
- **No**

Did you receive any other income between Sunday, May 10, 2020 and Saturday, May 16, 2020? This includes holiday pay, sick pay, and vacation pay.
- Yes
- **No**

23. Based upon MURPHY's PUA Registration, MURPHY received the following PUA payments, which were sent via direct deposit payments to MURPHY's CashApp account:

| Weekly Work Period | PUA Payment |
|---|---|
| March 7, 2020 | $317[2] |
| March 14, 2020 | $317 |
| March 21, 2020 | $317 |
| March 28, 2020 | $317 |
| April 4, 2020 | $917 |
| April 11, 2020 | $917 |
| April 18, 2020 | $917 |

---

[1] MURPHY's Weekly Certification for the week ending May 16, 2020 was denied because she failed to provide the DUA with additional documentation that the DUA had requested.

[2] Eligible PUA applicants could apply for and receive PUA benefits retroactive to March 2020. In MURPHY's May 10, 2020 PUA Registration, MURPHY applied for and received PUA benefits for weekly periods dating back to the week ending March 1, 2020 up to the week ending May 9, 2020.

7

| Weekly Work Period | PUA Payment |
|---|---|
| April 25, 2020 | $917 |
| May 2, 2020 | $917 |
| May 9, 2020 | $917 |
| **TOTAL** | **$6,770** |

24.  MURPHY knew that her PUA Registration and Weekly Certification for the week ending May 16, 2020 were false because MURPHY earned weekly salary from the Workforce Services Company well in excess of $89 per week for each of the weekly work periods ending March 7, 2020 to May 16, 2020.

25.  On or about May 25, 2020, MURPHY submitted a new PUA Registration using her correct personal identification information, but MURPHY's claim for PUA was rejected because MURPHY had also filed for UI unemployment benefits.

*MURPHY Applies for UI Benefits*

26.  On or about May 24, 2020, MURPHY submitted an application for UI benefits. In her UI application ("May 2020 UI Application"), MURPHY stated that her employment with the Workforce Services Company ended in or about May 2020.

27.  On or about June 22, 2020, MURPHY began her employment with the Trucking Company and, on or about July 3, 2020, received payroll of approximately $651.33 for working that week. MURPHY, however, submitted a Weekly Certification for UI benefits for the week ending June 27, 2020, in which she claimed she did not work or receive any income during such period. Based on this false Weekly Certification for the week ending June 27, 2020, MURPHY received UI benefits of approximately $972.

8

28. Thereafter, on or about November 1, 2020, MURPHY submitted an application for UI benefits.[3] In her UI application ("Nov. 2020 UI Application"), MURPHY claimed that her employment with the Trucking Company was scheduled to end on or about November 5, 2020.

29. From approximately May 2021 to September 2021, MURPHY submitted approximately fifteen false and fraudulent Weekly Certifications to the DUA in which MURPHY claimed to not have worked or received income, all while MURPHY was working for, and receiving regular weekly income as an employee of, the Trucking Company.

30. For example, for the week ending July 24, 2021, MURPHY stated that she did not work during such period, nor did he receive any income during such work week:

> Please review your responses for the **week of Sunday, 7/18/2021 through Saturday, 7/24/2021**.
>
> **Initial Questions**
>
> 1. Did you work during the reporting period listed above? This includes full-time, part-time, temporary, self or military employment.    N
> 2. During the week listed above:
>    Were you offered employment?    N
>    Quit a job?
>    Were you discharged from a job?    N
> 3. During the week listed above, did you receive or apply for income from any other sources that you have not previously reported to us?    N

MUPRHY certified to the DUA that the information that she provided was true and correct:

> **Acknowledgement**
>
> ☑ I certify that the information I have provided is true and correct. I know that Massachusetts Law provides penalties and or imprisonment for false statements to obtain benefits and that DUA actively pursues fraudulently collected benefits. I hereby acknowledge that DUA will verify my information to assure its accuracy.

---

[3] Because MURPHY had previously applied for and received UI benefits dating back to approximately May 24, 2020, the DUA treated MURPHY's November 1, 2020 application for UI benefits as a re-opening of her May 24, 2020 UI claim for UI benefits.

31. MURPHY knew that her Weekly Certification for the week ending July 24, 2021 was false because she was working for, and receiving regular income from, the Trucking Company during such period, as reflected by Murphy's Trucking Company pay records and personal bank records:

| Date | Description | | | | Amount |
|---|---|---|---|---|---|
| 07/23/21 | ROCHESTE█████:PAYROLL ID:9008194519 PPD | | ID:93424700004807X | INDN:MURPHY, JASMINE G   CO | 534.16 |
| 07/27/21 | MA DUA   DES: MA UI TAX ID: ID:IXXXXXXXXX PPD | | XXXXXXXXX | INDN:JASMINE G MURPHY   CO | 672.00 |
| 07/30/21 | ROCHESTE█████:PAYROLL ID:9008194519 PPD | | ID:93519100018979X | INDN:MURPHY, JASMINE G   CO | 287.46 |

32. On or about October 31, 2021, MURPHY submitted a new application for UI benefits. In her UI application ("Oct. 2021 UI Application"), MURPHY claimed that her employment with the Trucking Company ended on or about October 26, 2021.

33. From approximately January 2022 to February 2022, MURPHY submitted approximately six false and fraudulent Weekly Certifications to the DUA in which MURPHY claimed to not have worked or received income, all while MURPHY was working for, and receiving regular bi-weekly income as an employee of, the Suffolk County Sheriff's Department.

34. For example, for the week ending January 29, 2022, MURPHY stated that she did not work and did not earn wages during such weekly period:

> Below are your responses for the **week of Sunday, 1/23/2022 through Saturday, 1/29/2022**.
>
> **Online Interview**
>
> | | |
> |---|---|
> | Were you available for work and capable of working? | Y |
> | Did you complete 3 work search activities? | Y |
>
> **Your Earnings**
>
> | | |
> |---|---|
> | Did you work and earn wages? (This includes work performed in self-employment) | N |

10

MUPRHY certified to the DUA that the information that she provided was true and correct:

> **Acknowledgement**
>
> ☑ I certify that the information I have provided is true and correct. I know that Massachusetts Law provides penalties and or imprisonment for false statements to obtain benefits and that DUA actively pursues fraudulently collected benefits. I hereby acknowledge that DUA will verify my information to assure its accuracy.

35. MURPHY knew that her Weekly Certification for the week ending January 29, 2022 was false because she was working for, and receiving regular income from, the Suffolk County Sheriff's Department during such period, as reflected by Murphy's pay records and personal bank records:

| Date | Description | Amount |
|---|---|---|
| 02/01/22 | MA DUA   DES: MA UI TAX ID:   XXXXXXXXX INDN:JASMINE G MURPHY   CO   ID:IXXXXXXXXX PPD | 341.00 |
| 02/04/22 | COMM OF MASS   DES:TREHREMPL  ID:532969   SDS INDN:MURPHY,JASMINE GEORGET  CO   ID:AXXXXXXXXX PPD | 1,464.61 |

36. In total, from approximately May 2021 to September 2021 and from approximately January 2022 to February 2022, MURPHY fraudulently collected at least approximately $19,868 in UI funds through intentionally submitting false Weekly Certifications to the DUA in which MURPHY claimed that she did not work or receive any income.

## Scheme to Defraud the SBA

37. Beginning in or around April 2021, and continuing until at least in or around December 2021, in the District of Massachusetts and elsewhere, MURPHY devised a scheme to defraud, and to obtain PPP funds, by filing a false and fraudulent PPP loan application.

38. The purpose of the scheme was for MURPHY to obtain PPP loan proceeds under false and misleading pretenses, including false statements about her purported business's average monthly payroll, gross receipts, and expenses.

*MURPHY Applies for a PPP Loan*

39. In furtherance of the scheme, on or before April 8, 2021, MURPHY submitted a false and misleading PPP loan application to Customers Bank seeking approximately $17,708 in PPP loan funds (the "PPP Loan Application"). MURPHY caused the PPP Loan Application to be digitally signed and certified that the application and the information provided in all supporting documents and forms was true and accurate.

40. The PPP Loan Application falsely stated that the gross income for MURPHY's business, listed as a beauty salon, was $85,000 in 2020. In addition, MURPHY submitted with the PPP Loan Application what purported to be the Profit or Loss from Business for calendar year 2020 ("IRS Form Schedule C") for her alleged sole proprietorship. On the purported IRS Form Schedule C, MURPHY falsely claimed that her business had $85,000 in gross receipts in 2020.

41. MURPHY knew that her PPP Loan Application was false because (i) MURPHY did not, in fact, file any IRS Form Schedule C for 2020 with the IRS; and (ii) MURPHY did not have $85,000 in gross receipts from any sole proprietorship business during 2020.

42. On or about April 8, 2021, MURPHY's PPP Loan Application was approved, and on or about April 14, 2021, Customers Bank issued a $17,708 payment to MURPHY's bank account at Rockland Trust via a wire transfer in interstate commerce. Following the deposit of the $17,708 in PPP loan proceeds, MURPHY made approximately $16,100 in cash withdrawals; and after other debit purchases, MURPHY's account balance was only $32.35 as of May 26, 2021.

43. On or about December 18, 2021, MURPHY caused to be submitted a PPP Loan Forgiveness Application ("PPP Loan Forgiveness Application") to Customers Bank. In the PPP Loan Forgiveness Application, MURPHY falsely claimed that the entire $17,708 PPP loan was spent on payroll costs for her business. On or about December 20, 2021, MURPHY's PPP Loan Forgiveness Application was approved.

COUNTS ONE - SEVEN
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

The Grand Jury charges:

44. The Grand Jury re-alleges and incorporates by reference paragraphs 1-43 of this Indictment.

45. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

JASMINE MURPHY,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | May 10, 2020 | The PUA Registration caused to be electronically submitted by MURPHY, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 2 | April 8, 2021 | The PPP Loan Application caused to be electronically submitted by MURPHY, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 3 | April 14, 2021 | Wire transfer of $17,708 from Customers Bank to MURPHY's account at Rockland Trust. |
| 4 | July 25, 2021 | The Weekly Certification for the Week Ending July 24, 2021 caused to be electronically submitted by MURPHY, in Massachusetts, and routed interstate through servers outside of Massachusetts. |
| 5 | July 27, 2021 | DUA wire transfer of $672 to MURPHY's account at Bank of America. |
| 6 | January 30, 2022 | The Weekly Certification for the Week Ending January 29, 2022 caused to be electronically submitted by MURPHY, in Massachusetts, and routed interstate through servers outside of Massachusetts. |

| Count | Approximate Date | Description |
|---|---|---|
| 7 | February 2, 2022 | DUA wire transfer of $341 to MURPHY's account at Bank of America. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHT
False Statements to a Financial Institution; Aiding and Abetting
(18 U.S.C. §§ 1014 and 2)

The Grand Jury further charges:

46. The Grand Jury re-alleges and incorporates by reference paragraphs 1-43 of this Indictment.

47. On or about April 8, 2021, in the District of Massachusetts and elsewhere, the defendant,

### JASMINE MURPHY,

knowingly made and caused to be made a false statement and report for the purpose of influencing in any way the actions of Customers Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, upon any loan, as follows: in the PPP Loan Application, MURPHY falsely represented that MURPHY's business had gross income of $85,000, and in support of the loan application, MURPHY caused to be submitted a falsified IRS Form Schedule C.

All in violation of Title 18, United States Code, Sections 1014 and 2.

## WIRE FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

48. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts One through Seven, the defendant,

JASMINE MURPHY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following assets:

   a. $44,346, to be entered in the form of a forfeiture money judgment.

49. If any of the property described in Paragraph 48, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 48 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## FALSE STATEMENT FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(2)(A))

50. Upon conviction of the offense in violation of Title 18, United States Code, Section 1014, set forth in Count Eight, the defendant,

JASMINE MURPHY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offense. The property to be forfeited includes, but is not limited to, the following assets:

   a. $17,708, to be entered in the form of a forfeiture money judgment.

51. If any of the property described in Paragraph 50, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 50 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

ADAM W. DEITCH
DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: DECEMBER 12, 2024
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo

DEPUTY CLERK     at 4:14 PM